# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

SPENCER STAFFORD,

     Plaintiff,

                                   Case No. 3:21-cv-1007-TJC-LLL

v.

DUVAL COUNTY PUBLIC
SCHOOLS,

     Defendant.

_____

## O R D E R

Plaintiff Spencer Stafford is suing his employer, Duval County Public Schools ("DCPS"), for race discrimination, retaliation, and a hostile work environment, all under Title VII of the Civil Rights Act of 1964. Doc. 1. The claims are based on Stafford's concerns with the promotional process, failure to promote him, poor interactions with his supervisor, and limited response to his complaints about these concerns. Id. This case is before the Court on DCPS's Motion for Summary Judgment, Stafford's opposition, and DCPS's reply and all exhibits thereto. Docs. 44, 45, and 46 respectively.

I.     **Facts**[1]

A.  Overview of Stafford's Employment and the Promotional Process

Stafford, an African-American, started with DCPS in 1995 as a temporary carpenter and became a permanent carpenter a year later. Doc. 1 ¶10; Doc. 44-4 at 123. DCPS is part of the City of Jacksonville consolidated government and therefore Jacksonville's Civil Service and Personnel Rules and Regulations ("CS Rules") apply. [2] Doc. 44-15  ¶9. The CS Rules govern job description development, and job descriptions include promotional requirements determining eligibility for the job. Id. ¶10; Doc. 44-6 at 51-53.

When the number of qualified applicants exceeds the number of available positions, the CS Rules require a promotional exam, with positions awarded based on the highest passing score. Doc. 44-15 ¶12. If the number of openings and qualified applicants is the same, however, no promotional exam is required. Id. ¶11; Doc. 44-6 at 51-53 (citing CS Rule 4.03(1)(A)(3)).

Carpentry is one of several trade groups within Facilities Maintenance. See id. ¶¶13-14. In 2014, a Carpenter Lead Worker position was created,

---

[1] These facts are construed in the light most favorable to Stafford. In some instances, citations include CM/ECF page references for clarity. Citations to condensed deposition transcripts are to the deposition page number.

[2] Stafford's employment with DCPS is also governed by a Collective Bargaining Agreement. See Doc. 44-4 at 125-26.

responsible to assist the Carpenter Foreperson, Carlos Hendrix.[3] Doc. 44-15 ¶¶5-6; see Doc. 44-4 at 124-25, 140. The promotional requirements for Carpenter Lead were as follows: "[a]ll permanent employees who have served for one (1) year in the class of Carpenter and meet the open requirements may apply." Doc. 44-4 Exh. 18. Of the seven carpenters taking the exam, Stafford had the highest passing score and became Carpenter Lead. Id. at 124-25; Doc. 44-15 ¶6.

Other trade groups include Plumbing, Paint, HAR (Heat, Air, and Refrigeration), and Utilities. See Doc. 44-15 ¶¶13-14; Doc. 44-6 Exh. 3. Each of these trades has one or more foreperson[4] roles and one or more lead roles to assist a foreperson. See Doc. 44-6 at 32; Doc. 44-15 ¶14, Exh. D.[5] Promotional requirements for Plumbing, Paint, HAR, and Carpenter Foreperson allow employees with one year of the appropriate trade experience, including as lead, to apply.[6] Doc. 44-15 ¶14, Exh. D; see also Doc. 44-6 at 32. For Utilities,

---

[3] Once Hendrix became foreperson in 2007, he supervised all carpenters, including Stafford. See Doc. 44-4 at 140; Doc. 44-11 ¶¶5-6; Doc. 44-9 ¶3. As Carpenter Foreperson, Hendrix was on the committee that created the promotional exam for the lead role. Doc. 44-15 ¶24; Doc. 44-1 at 32.

[4] The Court references foreperson, but some documents use foreman.

[5] Exhibit A to Doc. 44-15 is missing, causing later exhibits to be mislabeled. The document referenced as Exhibit B is labeled as Exhibit A, etc. Information in the missing Exhibit A is elsewhere in the record.

[6] In 2016 the promotional requirements for Carpenter Foreperson were changed to the following: "[a]ll permanent employees who have served for a period of at least one (1) year in the class of Carpenter Lead Worker or

3

promotion to foreperson requires experience in the lead role, and often results in an automatic promotion without an exam from lead to foreperson if the foreperson role becomes available.[7] <u>See</u> Doc. 44-15 ¶15; Doc. 44-6 at 18-19, 29-30, 52-53.

In 2020, Hendrix announced plans to retire. Doc. 44-15 ¶8; Doc. 44-13 ¶13. At that time, Stafford was the only African-American in a lead role for a skilled trade. Doc. 1 ¶31. Anticipating there would be multiple qualified applicants, a committee of six people was formed to develop the promotional exam. <u>See</u> Doc. 44-15 ¶¶22-23. Four were from Facilities Maintenance: Hendrix; Guy Kuhl, Maintenance III Station Supervisor; Nerissa Hawkins (a/k/a Pospychala), Director of Maintenance; and Tarek Ghandour, Executive Director, Plant Services.[8] Doc. 44-15 ¶24; Doc. 44-5 at 4, 6; Doc. 44-13 ¶1; Doc.

---

Carpenter may apply." Doc. 44-4 Exh. 19. The previous promotional requirements did not reference experience in the Carpenter Lead position. <u>Compare</u> <u>id.</u>, <u>with</u> <u>id.</u> Exh. 1.

[7] DCPS attributes the difference to the fact that Utilities involves more than a single discipline and covers a broad variety of work. Experience as lead provides exposure to the wide variety of tasks, which is necessary for the foreperson role. Doc. 44-15 ¶16; <u>see</u> <u>also</u> Doc. 44-6 at 21-23, 30-31. Another example of automatic promotion occurred in 2016, when the electronics lead, Michael Costley, was promoted to Electronics Foreperson without an exam. Doc. 44-6 at 12-16. Electronics was part of Facilities Maintenance until 2019. Doc. 44-15 ¶17.

[8] Hendrix reported to Kuhl. Doc. 44-13 ¶¶1-2. Kuhl and Pospychala both reported to Ghandour. <u>See</u> <u>id.</u> ¶6; Doc. 44-9 ¶¶1-2; Doc. 44-5 at 7. Hendrix participated on the committee as a subject matter expert and had primary responsibility for math questions. Doc. 44-6 at 43; Doc. 44-1 at 28-31.

44-9 ¶1. The other two were Dawn Gaughan, District Staffing Supervisor; and Melissa Brandt, Support Technician, Civil Service Staffing; both of Human Resources.[9] Doc. 44-8 ¶¶1,3; Doc. 44-15 ¶¶23-24, Exh. G.[10]

The promotional exam included an interview and written exam. Doc. 44-15 ¶32. The written exam was the same for all applicants. Doc. 44-8 ¶8. The interview had standard questions and a standard scoring matrix, with each interview conducted by the same committee members.[11] Id.; Doc. 44-9 ¶31; Doc. 44-11 ¶18; Doc. 44-13 ¶21.

The exam was given to five employees in December 2020, but no one passed.[12] Doc. 44-15 ¶32. Because no one passed, the committee was required

---

[9] The level of participation in the committee for Brandt and Gaughan is unclear. Brandt stated she participated on the exam development committee, while Hendrix testified she only had responsibility to collect materials. Compare Doc. 44-1 at 37, with Doc. 44-8 ¶¶2-9. Multiple declarants state the committee had six members, including both Gaughan and Brandt, but Pospychala testified Gaughan only participated once to cover for Brandt. Compare Doc. 44-8 ¶3; Doc. 44-9 ¶21; and Doc. 44-13 ¶16; with Doc. 44-5 at 12-14. Resolving any issue of participation for Gaughan or Brandt is not necessary for the Court's ruling.

[10] As noted supra, the declaration references the email as Exhibit H, but it is labeled Exhibit G.

[11] The interview had seven questions and addressed topics such as identifying general safety rules, techniques to motivate employees, how to train and motivate employees about changes, how to deal with attendance problems, how to provide feedback, addressing employee resistance, and options to assess work needed if the workspace is not accessible. Doc. 44-1 Exh. 8.

[12] Passing is 70 or higher. Doc. 44-15 ¶12. At Stafford's deposition, counsel for DCPS showed him a log indicating he had reviewed the exam after

to revise the exam, changing at least 25% of the questions. Doc. 44-9 ¶37; Doc. 44-11 ¶26. The committee focused on changing questions with the highest error rate. Doc. 44-9 ¶37; Doc. 44-11 ¶26. The committee knew how many correct or incorrect answers were given to each question but did not know how any individual answered a particular question. Doc. 44-9 ¶37; Doc. 44-11 ¶26. The exam was given again, to seven employees, in January 2021. Doc. 44-15 ¶33. Only Daniel Hodges, Caucasian, passed, and he was promoted to Carpenter Foreperson. Doc. 44-15 ¶33; see Doc. 44-4 at 247-50.

Stafford expressed concerns that Hendrix shared exam information with others, but there was no evidence of this. Doc. 44-6 at 41-42, 49-50; see Doc. 44-4 at 74, 236-41; Doc. 44-8 ¶7. Each committee member signed a confidentiality agreement.[13] Doc. 44-15 ¶25. The committee met in a private room and did not take materials out of the room. Doc. 44-15 ¶25. Pospychala and other committee members knew Stafford had complained Hendrix shared information and that Stafford did not think he should have to take a promotional exam.[14] See Doc

---

taking it, but he denies ever having done so. Doc. 44-4 at 230-36, Exh. 30.

[13] The Confidentiality Agreements are at Doc. 44-8, Exh. A (Brandt); Doc. 44-11 Exh. A (Hendrix); Doc. 44-13 Exh. E (Kuhl); and Doc. 44-9 Exh. E (Ghandour). Pospychala's Confidentiality Agreement is not part of the record.

[14] There is no evidence other committee members knew of Stafford's complaints to the Office of Equity, discussed infra, except for Gaughan, who was contacted by Jackson, Executive Director. See Doc. 44-2 at 39, 45-56; see also footnote 19 infra.

44-5 at 18, 33-37. Three of the committee members–Hendrix, Kuhl, and Ghandour–had direct knowledge of Stafford's concerns about Hendrix since they received Stafford's email(s) or were involved in follow up to the emails (further discussion of emails and citations infra). Doc. 44-9 ¶1; Doc. 44-13 ¶1. Hendrix denied scoring Stafford's interview lower than other committee members or trying to influence other members to score Stafford's interview lower. Doc. 44-11 ¶24; Doc. 44-9 ¶33; Doc. 44-13 ¶¶23.

According to Gaughan, allowing promotions without an exam for Utility Foreperson (what was different than for Carpentry) violated CS Rules. Doc. 44-15 ¶20, Exh. G. Per Gaughan, "[n]o promotion can be given in Civil Service without testing and creating an eligibility list." Id. In contrast, Victoria Schultz, Assistant Superintendent, Human Resources, testified Gaughan was incorrect, and promotional requirements for foreperson are not required to be the same.[15] Doc. 44-15 ¶¶13, 21; Doc. 44-6 at 50-51. Stafford does not know what the CS Rules require. Doc. 44-4 at 75-76.

B. <u>Interactions with Hendrix</u>

Hendrix became Carpenter Foreperson in 2007, responsible to supervise all carpenters, including Stafford. Doc. 44-15 ¶4; Doc. 44-9 ¶¶3, 5. As Carpenter Lead, Stafford reported to Hendrix, shared an office with Hendrix, and had

---

[15] Schultz also confirmed this understanding with the Director of Employee Services for the City of Jacksonville. Doc. 44-15 ¶21.

responsibilities different from other carpenters, such as ordering supplies. See Doc. 44-4 at 129-30, 274-75; Doc. 44-9 ¶4; Doc. 44-15 ¶¶5, 7.

In 2018, Hendrix mentioned evaluations were coming up. Doc. 44-4 at 26-28. Stafford interpreted this as a threat because Hendrix had not made a similar comment before. Id. Stafford complained Hendrix communicated with him in a harsh and intimidating manner, used a condescending tone and mannerisms, provided unwarranted criticism, and failed to share project information. Doc. 1 ¶18; Doc. 44-4 at 31-35; Doc. 44-1 Exh. 9. Stafford documented interactions with Hendrix and others through notes and text messages to himself.[16] Doc. 44-4 Exhs. 4 (texts), 32 (notes). Even though Stafford complained Hendrix constantly withheld information, he could only

---

[16] The notes and texts are between 2016 to 2019, and primarily about Hendrix. See generally Doc. 44-4 Exhs. 4, 32. Two notes are labeled "harassment," and describe incidents on April 4, 2017, about Hendrix checking GPS for Stafford's location (CM/ECF p. 479), and on May 14, 2018, describing an interaction about responsibility for schools and Hendrix saying there would be an exam for the foreperson job once he retired (CM/ECF p. 504). Other examples include the following: on February 22, 2017, Stafford and Hendrix argued about priority of work orders (CM/ECF p. 475); on March 12, 2017, Stafford and Hendrix had a disagreement about completion of work and a timesheet (CM/ECF p. 477); on April 6, 2017, there was an argument about receipts not being in order (CM/ECF p. 480); on June 1, 2017, coworker remark about "Black guys" playing ball and Hendrix remarked about using a black trash bag to go out in the rain (CM/ECF p. 488); on September 8, 2017, Hendrix told Stafford to get the "f---" out of the way (Stafford responds saying "don't mess at me or treat me like a child") (CM/ECF p. 493). Some of the notes describe what Stafford believes to be errors by Hendrix, such as ordering the wrong part, smoking or lying about smoking, or improperly scheduling a project. E.g., Doc. 44-4 Exhs. 4, 32.

recall a few specific instances. See Doc. 44-4 at 31-45, 262-68; Doc. 44-9 ¶7.

Stafford testified there were often problems with Hendrix's demeanor, and that Hendrix cursed at him once. See Doc. 44-4 at 40-45, 262-68. Stafford thought Hendrix was abrupt with other employes but was more abrupt with Stafford and that Hendrix did not treat Caucasian employes in a similar manner. Doc. 44-4 at 274-75, 327. Others testified Hendrix could be harsh or gruff, but that Hendrix did not treat Stafford differently than others. Doc. 44-3 at 20-21; Doc. 44-7 ¶¶4-5; Doc. 44-9 ¶6; Doc. 44-10 ¶4; Doc. 44-12 ¶¶4-5; Doc. 44-14 ¶4. Hendrix knew he sometimes got on Stafford's nerves. Doc. 44-11 ¶9.

Stafford could not recall Hendrix making any racial comments to or about him. Doc. 44-4 at 259-62. Hendrix called Stafford a narcissist, which Stafford thought might have been a disguised racial slur. Doc. 44-4 at 177-78, 190-92. A painter, Timothy Haynes, testified Hendrix made two racial comments between 2015 and 2017.[17] Doc. 45-6 at 6, 26-40. Haynes did not report either comment and neither comment was about Stafford. See Doc. 45-6 at 26-36. There was no other evidence of Hendrix making racist remarks. See Doc 44-3 at 14-17; Doc. 44-7 ¶¶4-5.

---

[17] One instance was Hendrix telling someone he was "tired of these black bitches" complaining, referring to a Black principal. Doc. 45-6 at 26-33. Another comment was after a Black child asked a question about breakfast and Hendrix commented, "I guess these black bitches can't feed their kid [sic] at home." Doc. 45-6 at 35-36.

C. <u>Complaints and Response</u>

In March 2018, prompted by a complaint from Stafford, there was a meeting with Stafford, Hendrix, Kuhl, and Ghandour to discuss communication between Stafford and Hendrix.[18] Doc. 44-4 at 287, Exh. 4 (CM/ECF p. 158). More than a year later, in June 2019, Stafford sent an email to Kuhl with the subject line "Communication between [Hendrix] and [Stafford]" and mentioned "hit and miss" communication. Doc. 44-13 Exh. A. The email provided examples of "communication breakdowns" and complained Hendrix talked to him in a "demanding tone." <u>Id.</u> There was no mention of race or discrimination. <u>See id.</u> Kuhl shared the information with Ghandour, and Ghandour asked Hendrix to be more aware of his tone of voice. <u>Id.</u> ¶6. They suggested the office be rearranged to address Stafford's concern that Hendrix was "looking over his shoulder." <u>Id.</u> Kuhl and Ghandour acknowledged Hendrix can use a harsh tone or communicate in a gruff manner, but believed this was how Hendrix sometimes communicated and the issues between Hendrix and Stafford reflected a personality conflict, not complaints of race discrimination. <u>Id.</u> ¶¶ 3-10; Doc. 44-9 ¶¶6-13.

In June 2020, Stafford emailed Kuhl and Ghandour again, with the subject line "Problems with [Hendrix]" and stated:

---

[18] Hendrix reported to Kuhl, who reported to Ghandour. Doc. 44-13 ¶¶1-2, 6; Doc. 44-9 ¶¶1-2.

> I'm still having problems with Mr. Carlos Hendrix and the way he communicates with me. His tone and body language, which I guess are supposed to be intimidating, . . . are still problematic. He continues to keep important information from me until the last minute. I'm sure he highlights to you whenever I make a mistake, but I don't make no more mistakes than him, that's a fact.

Doc. 44-13 Exh. B. In email or other communications with Kuhl and Ghandour, Stafford did not mention discrimination or claim issues were due to race. Id. ¶¶4-9; Doc. 44-9 ¶¶7-8, 11-13; see also Doc. 44-4 at 326.

On June 29, 2020, Stafford complained to the Office of Equity and Inclusion/Professional Standards ("Office of Equity").[19] Doc. 44-4 at 174-80, Exh. 33; Doc. 44-15 ¶27. Stafford followed up by email July 20, 2020, and spoke to the head of the office, Sherry Jackson, a few days later. Doc. 44-4 Exh. 33; Doc. 44-2 at 24-37, Exh. 2. These complaints were largely about not being automatically promoted to foreperson and the testing process, but Stafford also mentioned race concerns. Doc. 44-2 at 24-37, Exh. 2. Stafford complained Black applicants were being overlooked and Jackson understood his complaints about unfairness in the promotion process were also based on his race. Doc. 44-2 at 30-32. Although Stafford and Jackson spoke in July, there was not further communication between them until Stafford reached out again (twice) in November 2020, regarding the promotional exam for Carpenter Foreperson.

---

[19] Around this time, the head of the Office of Equity changed from Josephine Jackson to Sherry Jackson. See Doc. 44-2 at 22-24; Doc. 44-4 at 286-87, Exh. 33.

Doc. 44-2 Exh. 7. Jackson followed up with Gaughan on November 19, 2020, and Gaughan believed the concern was about CS Rules and "did not fall under the Office of Equity."[20] Doc. 44-2 at 46-48, Exh.7. Jackson did not treat it as a complaint her department needed to investigate. Doc. 44-2 at 48-53.

DCPS did an investigation into Stafford's concerns about the promotional exam and process for developing the exam but did not investigate his concerns about discrimination or harassment. Doc. 44-6 at 38-39. The DCPS investigation concluded the promotional process and exam were proper and no information had been improperly shared. Id. at 38-44.

## II.   **Analysis**

### A. Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Further, the Court will construe evidence in the light most favorable to Stafford. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014).

---

[20] This may be what prompted Gaughan's email in November 2020, stating lack of a promotion exam for Utilities Foreperson violated CS rules. Doc. 44-15 ¶¶23-24, Exh. G. Jackson thought Stafford did have meetings with other HR representatives during the interim. Doc. 44-2 at 47-48. At some point, Stafford asked to review his personnel file but was told the file was not in place and once he could review the file, realized an evaluation was missing. See Doc. 44-4 at 271, Exh. 4 (CM/ECF p. 167).

B. Overview

Stafford brings claims for race discrimination, retaliation, and a hostile work environment. See generally Doc. 1. DCPS disputes each claim. See generally Doc. 17. Stafford's primary complaint is about the promotional process to Carpenter Foreperson. Stafford argues, as Carpenter Lead, he should have been promoted automatically, like the process for Utilities Foreperson, and that even if an exam was required, the exam development process and exam itself were flawed and biased. His complaints about the promotion process apply to the discrimination and retaliation claims. Stafford also complains about interactions with his supervisor, alleging Hendrix created a hostile work environment and that Hendrix's involvement in the promotion process allowed for bias and negatively impacted Stafford. See Doc. 1.

C. Promotion Process for Carpenter Foreperson

Stafford's main argument is he should have been automatically promoted to Carpenter Foreperson because he was the only Carpenter Lead. He argues such automatic promotions have happened historically in trades, but there is no evidence to support this. Of the six trade groups, only two have recently used or allowed automatic promotions– Utilities and Electronics (which moved out of Facilities Maintenance in 2019). When Hendrix announced his retirement in 2020, Utilities was the only trade in Facilities Maintenance with an automatic promotion process, and the four others, including Carpentry, used a

13

promotional exam–open to employees who met the experience requirements, either in the trade or as lead. Using promotional exams has been the process for each of these trades for multiple years, even decades.

Stafford essentially argues the promotion process was changed to negatively impact him, but there is no evidence to support this.[21] The Carpenter Lead position was created in 2014, and Stafford became lead in 2015. Before the Carpenter Lead position existed, promotion to Carpenter Foreperson required one year of carpenter experience.[22] After Stafford became lead, the promotional requirements for Carpenter Foreperson were changed once–to allow experience as either lead or carpenter to satisfy the promotion requirements. The change specifically allowed lead experience to also meet the promotional requirement. There is no evidence that promotion to Carpenter Foreperson was ever limited to individuals with lead experience.

Stafford next argues the trades should have to use the same process and different promotion practices among the trades violate CS Rules and is

---

[21] Alternatively, Stafford claims when he moved to the lead position, he was told he would be automatically promoted to foreperson without an exam. The record lacks evidence of who allegedly said this and an automatic promotion to Carpenter Foreperson is contradicted by the record evidence showing promotional eligibility always included carpenter experience and was never limited to lead experience.

[22] There was no reference to lead experience because the lead role did not exist.

14

discriminatory towards him.[23] As support, Stafford relies on Gaughan's email. This fails for two reasons. One, there is no evidence the CS Rules require promotional requirements be the same for different trade groups. Two, Gaughan's email states promotional exams are required and the lack of an exam for Utilities is a violation of CS Rules. Therefore, even if Gaughan is correct, a promotional exam was required for promotion to Carpenter Foreperson.

Stafford also has complaints about the exam and its development. These include (1) information about study materials was confusing, (2) exam questions were scored incorrectly, (3) there should not have been an interview component, and (4) an outside vendor should have developed and administered the exam. Critically, there is no evidence of different treatment with the exam. The same written exam (each time) was given to everyone and scored the same. The same interview questions and scoring matrix were used and the committee members participating in interviews were the same. The study resources identified were the same for everyone.

The issue for the Court is whether the exam was discriminatory or retaliatory for Stafford and not whether the exam was good or fair or whether

---

[23] Stafford argues there was "unequal treatment in [the DCPS] promotion procedure for the open Carpenter Shop Foreman position which required an internal examination when other Caucasian leadermen/lead workers had been promoted directly to vacant foreman positions without taking and passing an internal examination." Doc. 1 ¶32.

study materials were helpful or confusing. See Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (noting a court will "not sit as a super-personnel department that reexamines an entity's business decisions.") (quoted authority omitted). Because the exam, including the interview portion, was the same for everyone, Stafford's complaints about the exam are not evidence of discrimination or retaliation.[24] Similarly, while use of an outside vendor might be preferable, there was no requirement to do so and failure to use an outside vendor, under circumstances here, is not evidence of discrimination, retaliation, or ultimately of pretext.

    D. Race Discrimination Claims

    Stafford does not allege direct evidence of race discrimination, so the claim is analyzed under the McDonnell Douglas burden shifting framework.[25] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, "[i]f the plaintiff makes out a prima facie case, the burden then shifts

---

[24] There is no evidence that the test key to either exam was incorrect, that any question was scored differently for an individual, or that any question was improper or discriminatory. Stafford testified about one question and answer he thought was incorrect, but his testimony indicates he misinterpreted the question. Doc. 44-4 at 217-26.

[25] The Court is mindful the McDonnell Douglas paradigm is an evidentiary framework that does not change the ultimate question of whether there is enough evidence to establish illegal discrimination. Tynes v. Fla. Dept. of Juv. Just., 88 F.4th 939, 941 (11th Cir. 2023).

to the defendant to articulate a legitimate reason for the adverse action. If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." <u>Hurlbert v. St. Mary's Health Care Sys., Inc.</u>, 439 F.3d 1286, 1297 (11th Cir. 2006) (internal citation omitted).

To establish a prima facie case of race discrimination, Stafford must show: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." <u>Maynard v. Bd. of Regents</u>, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802). To satisfy the fourth element, the alleged comparator must be "similarly situated in all material respects." <u>Lewis v. City of Union City</u>, 918 F.3d 1213, 1224 (11th Cir. 2019). A similarly situated comparator will ordinarily have (1) engaged in the same behavior; (2) been subject to the same employment policy, guideline, or rule; (3) had the same supervisor; and (4) shared a similar employment or disciplinary history. <u>Id.</u> at 1227-28.

To establish pretext, the plaintiff must show "the proffered reason was not the true reason for the employment decision . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Jackson v. Ala. State Tenure Comm'n</u>, 405 F.3d 1276,

1289 (11th Cir. 2005) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). The evidence for pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (cleaned up).

Stafford cannot establish a prima facie case. While he is a member of a protected class and failure to promote is an adverse employment action, there is not a comparator and Stafford was not qualified because he did not pass the exam.[26] Because Hodges passed the exam, he is not a proper comparator. Examples of automatic promotions from the Electronics or Utilities groups do not involve comparators because the promotion requirements for those trade groups were different. Even if Stafford could establish a prima facie case, he lacks evidence to rebut the legitimate reason he was not selected for Carpenter Foreperson–he failed to pass the exam.

Stafford argues the alleged problems with the promotion process and

---

[26] As discussed above, Stafford argues the exam was improper, especially the interview portion. Doc. 45 at 8. Even if the interview scores were eliminated, however, Stafford did not have a passing score on either written exam. On the first exam, he answered 39 of 60 correctly, a score of 65%, and scored lower on the second exam, answering 38 of 60 correctly. Id. Seventy percent is the lowest passing score. Doc. 44-15 ¶12.

exam amount to pretext, sufficient to survive summary judgment.[27] For example, he argues justifications for difference in promotional requirements among different trades were not documented, were subjective, and were provided only after the Carpenter Foreperson exam was developed and given. Doc. 45 at 1. This presumes documented justification for the differences are required, but there is no evidence of such a requirement. Further, Stafford has not provided evidence to call DCPS's reasons for promotional differences among the trades into question, much less evidence to show that differences were due to his race, and such a disagreement is insufficient to establish pretext. See Chapman, 229 F.3d at 1030.

Two racial remarks from Hendrix between 2015 and 2017, made when Stafford was not present, not about Stafford and not about the promotion process (which involved a number of people besides Hendrix), are not sufficient to establish pretext as it relates to the promotion process and decision in 2020 and 2021. See Maholanyi v. Safetouch of Tampa, Inc., No. 3:14-cv-1161-TJC-JRK, 2016 WL 3595743, at *6 (M.D. Fla. July 5, 2016) (noting that even if alleged age remarks were made by supervisor they were insufficient to establish

---

[27] Stafford argues the lack of investigation into his complaints is a deviation from process that shows pretext and seems to argue a reasonable investigation might have resulted in a different outcome with the foreperson exam or promotion. Doc. 45 at 15. These arguments are addressed in the retaliation section.

pretext) (citing <u>Scott v. Suncoast Beverage Sales, Ltd.</u>, 295 F.3d 1223, 1229 (11th Cir. 2002) (additional citations omitted)). Stafford's attempts to show pretext are just disagreements with business decisions made by and policy implemented by DCPS. Stafford "is not allowed to recast [DCPS's] proffered nondiscriminatory reasons or substitute his business judgment for that of [DCPS]." <u>Chapman</u>, 229 F.3d at 1030.

Alternatively, Stafford argues there is a "convincing mosaic" of circumstantial evidence sufficient to support a triable issue. Doc. 45 at 10-16. Stafford argues it is improper to allow automatic promotions for Utilities but not other trades, the interview was subjective, and an investigation would have shown racial animus. <u>See</u> <u>id.</u> Stafford's complaints about process problems or weaknesses, fall well short of evidence that allows a fact finder to conclude Stafford was not promoted due to his race. These concerns do not create a convincing mosaic that Stafford's race played a role in the decision to not promote him or in development of the exam. <u>Cf.</u> <u>Jenkins v. Nell</u>, 26 F.4th 1243, 1250-51 (11th Cir. 2022) (reversing summary judgment for defendant–employer and finding a convincing mosaic based on disparate discipline, race–based comments, large number of departures of white operators after new manager, and additional evidence).

Therefore, summary judgment is due to be granted in favor of DCPS as to the race discrimination claim.

E. Retaliation

A prima facie case of retaliation under Title VII requires (1) protected activity, (2) a materially adverse action, and (3) a causal connection between the two. Kidd v. Mando Am. Corp., 731 F.3d 1196, 1211 (11th Cir. 2013). Stafford is unable to establish a prima facie case because there is no adverse employment action causally connected to any protected activity.

As a starting point, the promotional requirements for Carpenter Foreperson have not changed since being updated in 2016. Stafford made multiple complaints about Hendrix, but there is no evidence Stafford complained in 2016 or before, so the promotional requirements did not change because of Stafford's complaints. Accordingly, to the extent the retaliation claim is based on not being automatically promoted or having to take the exam, there is not a prima facie case of retaliation, because there is no protected activity causally connected to the development of the promotion requirements in 2016.

Stafford complained to Kuhl, Ghandour, sometimes both, about problems with Hendrix in 2018, 2019, and 2020, These complaints described Hendrix withholding information, using a harsh tone or aggressive body language, engaging in unwarranted criticism of Stafford, and other communication problems with Hendrix. Stafford did not tell Kuhl or Ghandour he thought the problems were related to his race or possible race discrimination. These complaints are not protected activity. See Hunsaker v. Found. Partners Grp.,

21

LLC, No. 6:18-cv-1996-ACC-DCI, 2020 WL 10355118, at *11 (M.D. Fla. Dec. 23, 2020) (noting complaints about rude or dismissive behavior not based on a protected characteristic is not protected activity) (citing Coutu v. Martin Cty. Bd. of Cty. Comm'rs, 47 F.3d 1068, 1074 (11th 1995)).

Stafford argues the temporal proximity between his complaints and the exam process is sufficient to show causal connection. Doc. 45 at 16-17. The last of these complaints was at least three months before the exam committee began meeting in late October See Doc. 44-9 Exh. B. Even if viewed as protected activity, the complaints are too distant from any adverse action to support a causal connection solely based on temporal proximity. See Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1182 (11th Cir. 2010) (citations omitted).

Stafford also complained in July and November 2020 to the Office of Equity, and those complaints did mention race. The Office of Equity concluded the complaints were primarily about the promotion process and not race. Therefore, it did not investigate, even though it arguably should have. It did, however, bring the concern to the attention of others with responsibility to address the testing concerns. DCPS did assess whether it was proper to have a promotional exam for the Carpenter Foreperson, whether Hendrix should have participated, and whether Hendrix shared information.

Stafford argues the failure to investigate is an adverse action supporting retaliation. However, the failure to investigate a complaint is generally not

construed as retaliation for making the same complaint. <u>Perry v. Schumacher Grp. of La.</u>, No. 2:13-cv-36-JES-NPM, 2020 WL 6938391, at *3 (M.D. Fla. Nov. 25, 2020) (noting failure to investigate a complaint is generally not considered an adverse action because the employee does not suffer harm as a result of the failure to investigate) (citing <u>Entrekin v. City of Panama City, Fla.</u>, 376 F. App'x 987, 995 (11th Cir. 2010)).

Stafford contends "being subjected to a flawed promotional process" is an adverse employment action. Doc. 45 at 17. Because Stafford did not pass the promotional exam, the failure to promote is not an adverse action that can support his retaliation claim. Nonetheless, Stafford argues his complaints about Hendrix improperly impacted the promotion process, including development of the exam. Specifically, Stafford argues Hendrix should not have participated in developing the exam or in selecting the new foreperson and that Hendrix biased other committee members by sharing information about Stafford's complaints. <u>See</u> Doc. 45 at 15-17; Doc. 44-4 at 80, 167.

Three committee members–Hendrix, Kuhl, and Ghandour–knew of Stafford's complaints about Hendrix because they were involved in receiving and responding to Stafford's concerns. Hendrix mentioned to others on the committee that Stafford thought Hendrix shared information and Stafford objected to taking the exam. There is no evidence committee members, apart from Gaughan, knew of Stafford's complaints to the Office of Equity. The

requirement for Stafford to take the exam existed prior to his complaints. Therefore, the complaints did not cause Stafford to have to take the exam and are not causally related to the requirement that Stafford take the exam. Although most committee members knew Stafford objected to the exam or had complaints about Hendrix, there is no evidence, apart from Stafford's speculation, this impacted development of the exam or the promotional process.

Finally, Stafford complained Hendrix shared information about the exam, but admitted he did not have direct knowledge Hendrix had shared information. Assuming arguendo that such sharing could be an adverse employment action, DCPS did investigate this concern and did not find evidence of sharing. Apart from Stafford's own belief, there is no evidence that Hendrix shared information with others. Therefore, Stafford's surmise about improper sharing is not sufficient for a prima facie case or to establish pretext. See Hunsaker, 2020 WL 10355118, at *11 (noting "the non-moving party cannot create a genuine issue of material fact through speculation") (citing Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008)).

If a prima facie case were established, the burden shifting of McDonnell Douglas would apply, and Stafford must provide evidence to show the reason for an adverse action is pretextual. As already discussed, there is no evidence showing the reason Stafford was not promoted to Carpenter Foreperson was pretext, because it is undisputed he failed the exam. No other adverse action is

at issue. Accordingly, summary judgment is due to be granted in favor of DCPS as to the retaliation claim.

F. Hostile Work Environment

To establish a race-based claim for a hostile work environment, Stafford must prove (1) he belongs to a protected class, (2) he was subjected to unwelcome harassment based on race, and (3) the harassment was severe or pervasive enough to alter the terms and conditions of his employment. Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1248-49 (11th Cir. 2014). Only conduct that is based on a protected category, such as race, may be considered in a hostile work environment analysis. Jones v. UPS Ground Freight, 683 F.3d 1283, 1297 (11th Cir. 2012). Behavior that is merely unfair or rude, but not tied to a protected characteristic, does not support a hostile work environment. Hunsaker, 2020 WL 10355118, at *11 (citing Coutu, 47 F.3d at 1074).

Stafford complains Hendrix was a poor communicator, withheld critical information, and was often abrupt, threatening, and intimidating. Stafford complains Hendrix once cursed at him. A painter overheard Hendrix make two racial remarks between 2015 and 2017, but neither remark was made to or about Stafford. Stafford believed Hendrix communicated poorly or harshly with others, but the behaviors were worse with Stafford, especially compared to how Hendrix treated Caucasian employees. Other DCPS employees, including people who supervised Hendrix and people whom Hendrix supervised, agree he

25

sometimes communicated in a harsh style. Stafford complained these behaviors occurred often or constantly over a period of years but could offer only a few examples of the problem behavior, despite sending himself texts and making notes. Harris v. Public Health Tr. of Mia.-Dade Cnty., 82 F.4th 1296, 1305 (11th Cir. 2023) (affirming summary judgment for employer on hostile work environment claim even though one comment was highly offensive, because offensive remark was not directed at plaintiff and remaining incidents over several years were not "sufficiently severe or pervasive to alter the terms and conditions of her employment.")

Apart from Stafford's own belief that Hendrix treated him more harshly because of his race, there is no evidence that any poor behavior was due to Stafford's race, and even if it were attributable to race, it does not rise to the level of being severe or pervasive. Therefore, summary judgment is due to be granted in favor of DCPS as to the hostile work environment claim.

## III.   Conclusion

The evidence showed that Hendrix was a difficult boss, who made racial remarks in the past (not addressed to Stafford), and that he and Stafford had a challenging relationship. The evidence also shows there were potential inconsistencies in the DCPS promotion process. But there are no triable issues that the failure to promote Stafford was based on his race or that DCPS retaliated against him. Use of a promotional exam for Carpenter Foreperson

was not discriminatory or retaliatory. Even if Stafford could establish a prima facie case of discrimination or retaliation, he cannot rebut the legitimate reason he was not promoted–because he did not pass the promotional exam. The hostile work environment claim fails because there is no evidence of severe or pervasive treatment impacting the terms and conditions of Stafford's employment.

Accordingly, it is hereby

**ORDERED:**

1. Defendant's Motion for Summary Judgment, Doc. 44, is **GRANTED**.

2. The Clerk is directed to enter judgment in favor of Duval County Public Schools and against Spencer Stafford and close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 11th day of March, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

ddw
Copies to:
Counsel of record